**BANCO DE MEXICO, as Trustee for Fondo de Garantía y Fomento para las Actividades Pesquera and Fondo Especial de Asistencia Técnica y Garantía para Créditos Agropecuarios, Plaintiff,**

v.

**ORIENT FISHERIES, INC. dba OFI Markesa International, Defendant.**

Case No. CV 07–7043 GAF (AJWx).

United States District Court, C.D. California.

Jan. 21, 2010.

Daska P. Babcock, Jeffrey V. Commisso, and Robert B. Mullen from Schiff Hardin, LLP, San Francisco, for plaintiff, Banco de Mexico.

Aaron P. Rudin and Calvin E. Davis from Gordon & Rees, LLP, Los Angeles, for defendant.

MEMORANDUM & ORDER REGARD-ING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR PAR-TIAL SUMMARY JUDGMENT

GARY ALLEN FEESS, District Judge.

## I. INTRODUCTION & BACKGROUND

Orient Fisheries, Inc. dba OFI Makesa International ("OFI") is an American business engaged primarily in the importation of seafood, including Mexican shrimp, for resale to its wholesale customers. (*See* Pl.'s Mot. Summ. J., Statement of Genuine Issues ("SGI") ¶ 6.) OFI has been involved in the importation of shrimp from Mexico since at least 1995.(*Id.*)

### A. THE OFI/HABAIRE CONNECTION

To further its business interests in Mexico, OFI designated Habaire, S.A. de C.V. ("Habaire") as its local agent and assigned one of its employees, Raul Gutierrez ("Gutierrez"), to act as OFI's local liaison in

Mexico. (*Id.* ¶¶ 9, 17.) Under a general power of attorney executed by OFI, Gutierrez was given the authority, on OFI's behalf, to initiate lawsuits, to institute other collection activities, and to conduct other administrative acts in connection with Habaire's dealings with Mexican fishermen. (*Id.* ¶ 14; Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 14.) In 2002, to consolidate its Mexican operations, OFI entered into a written agreement with Habaire (the "Habaire Agreement") through which OFI assured itself of a consistent supply of Mexican shrimp for import by funding the operations of shrimp producers through Habaire and agreeing to purchase their catch. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 29.) Through 2002, Habaire funded the operation of shrimp producers with proceeds obtained from OFI, which funded the loans out of its line of credit from Comerica Bank. (*See id.*; Def.'s Mot. Summ. J., SGI ¶ 50; Pl.'s Mot. Summ. J., SGI ¶ 40.)

## B. THE MEXICAN GOVERNMENT LOAN TRANSACTION

At some point, OFI became interested in altering the way in which it operated in Mexico. (*See* Pl.'s Mot. Summ. J., SGI ¶ 20.) It approached Banco de México to express its interest in participating in a government loan guarantee program, Fondo de Garantía y Fomento para las Actividades Pesqueras ("FOPESCA"),[1] for which Banco de México served as trustee. (*Id.* ¶¶ 1, 2, 20.) Accordingly, in 2004, OFI ceased funding the operation of shrimp producers out of its own line of credit and entered into a complex arrangement (the "Habaire Servicing Agreement") under which Habaire would fund the operations of shrimp producers with FOPESCA proceeds obtained from banks participating in the program. (*See* Second Am. Compl. ("SAC"), Ex. B at 1–13; *see also* Soto Decl. ¶ 18.) Although OFI orchestrated the negotiation of the Habaire Servicing Agreement with Banco de México, (*see* Soto Decl. ¶ 17.), Banco de México was not a signatory to the agreement. (SAC, Ex. B at 85.) Rather, the signatories to the Habaire Servicing Agreement were OFI, Habaire, Francisco Javier Bernal (one of Habaire's owners) (Pl.'s Exs. Opp'n. Def.'s Mot. Summ. J., Ex. 21.), and J.P. Morgan, as trustee of the Habaire Trust, a "Special Purpose Vehicle" ("SPV") through which the FOPESCA proceeds would be deposited and then transmitted to Habaire for disbursement to shrimp producers. (SAC, Ex. B. at 1–13.)

The Habaire Servicing Agreement, which was executed in mid–2004, included the following salient features:

(1) Commercial banks would deposit proceeds in a Special Purpose Vehicle ("SPV") which operated as a trust with J.P. Morgan acting as trustee. (SAC ¶¶ 80–81; Soto Decl. ¶ 18.)

(2) The SPV in turn would provide Habaire with funds to be loaned to shrimp producers subject to specified terms and conditions. (SAC, Ex. B at 2; *id.* ¶¶ 80–81.) When the loan to a producer was funded, the loan package was purchased from Habaire with funds held by the SPV. (*Id.* ¶¶ 80–81.)

(3) Habaire would manage the loans and collect the proceeds from shrimp producers, who repaid the loans with their

---

1. FOPESCA is part of a larger government lending program, Fideicomisos Instituidos en Relación con la Agricultura ("FIRA"), which is designed to give small businessmen, farmers, shrimp producers and other small fishing businesses access to credit. (Pl.'s Mot. Summ. J., SGI ¶¶ 1, 2; Soto Decl. ¶ 5.) Banco de México is the trustee of all of the trusts established under the loan program. (Pl.'s Mot. Summ. J., SGI ¶ 1.) The program provides guarantees to commercial banks who participate in the program in the event of default. (*Id.* ¶ 3.)

catch. (SAC, Ex. B at 5–9.) Habaire would then deliver the proceeds to J.P. Morgan for deposit into the SPV and ultimate repayment of the commercial banks. (*Id.*)

(4) OFI would, among other things, guarantee Habaire's performance by indemnifying and holding J.P. Morgan harmless for any damages resulting from Habaire's breach of its obligations under the terms of the Habaire Servicing Agreement. (*Id.*, Ex. B at 10.)

This transaction, which provided working capital for shrimp producers, is referred to as Stage 1 financing. (*See* Soto Decl. ¶ 4.)

In late 2004, the Habaire Servicing Agreement was amended to create a means by which Habaire could obtain inventory financing under FOPESCA through the use of certificates of deposit that were issued by registered warehouses and that represented title to goods held in storage. (Soto Decl. ¶¶ 9, 19; *see also* Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 33.) The amendment provided in substance that:

(1) Shrimp received by the shrimp producers would be stored in registered warehouses that would issue certificates of deposit that would be delivered to Habaire. (Soto Decl. ¶ 9; *see also* Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 33.)

(2) J.P. Morgan, as trustee of the SPV, was authorized to receive and hold certificates of deposit as security to permit Habaire to obtain short term inventory financing from the trust funds. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 33.) The agreement provided financial incentives to Habaire to repurchase the certificates within a specified time limit. (*Id.*)

(3) J.P. Morgan was authorized, in turn, to endorse the certificates of deposit to the commercial banks that funded the SPV. (*See* Pl.'s Mot. Summ. J., SGI

¶¶ 56, 58.) The commercial lenders could, upon the exercise of their guarantee rights under the government loan program, endorse and transfer the certificates to Banco de México. (*See id.* ¶¶ 57, 59.)

(4) As security for this arrangement, OFI granted Banco de México a put option under which Banco de México could, within thirty (30) days of the receipt of the certificates, "put" the certificates to OFI which was obligated to purchase those certificates within ten (10) days of the bank's exercise of the option. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 33.)

This aspect of the transaction was known as Stage 2 financing. (*See* Soto Decl. ¶ 7; Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 22 [Nuñez Depo.] at 237.)

## C. HABAIRE'S DEFAULT

For reasons that are not entirely clear from the record, Habaire had defaulted on its obligations the Stage 2 financing arrangement by late 2006. (SAC ¶ 104.) In January 2007, Invex and IXE, the commercial lenders who funded the SPV, declared Habaire in default on the inventory provision of the agreement. (Pl.'s Mot. Summ. J., SGI ¶ 54.) Banco de México, as trustee under the government loan program, paid Invex and IXE pursuant to the government guarantees. (*Id.* ¶ 55.) Invex and IXE then endorsed the certificates of deposit they had received as security for the inventory financing and delivered the certificates to Banco de México (*id.* ¶¶ 57, 59.), and Banco de México, exercised its put option. (*Id.* ¶ 61.) However, OFI claimed to be unaware that the put option existed and refused to purchase the certificates. (*Id.* ¶¶ 64–65.) This lawsuit followed.

## II. THE LAWSUIT AND MOTIONS

In the present lawsuit, Plaintiff Banco de México sues for breach of contract, fraud, money had and received and unjust enrichment and negligent supervision. It contends that, OFI, through its authorized agent, Raul Gutierrez, entered into the Stage 2 financing agreement through which OFI agreed to guarantee repayment by granting the lender a put option. It further contends that OFI concealed Gutierrez's alleged dishonesty in his dealings with OFI, and allowed him to act on OFI's behalf in Mexico, without guidance, direction or supervision, for the sole purpose of recovering OFI's losses arising from Gutierrez's alleged dishonest acts. As a result, Habaire, OFI's agent in Mexico, was able to obtain financing through the government loan program on the strength of OFI's background and history as a shrimp importer at a time when OFI was facing a financial catastrophe that was concealed from the Mexican creditors.

Banco de México now moves for summary judgment on its claim for breach of the put option contract. It argues that the put option contract is valid and enforceable, that OFI was obligated upon proper notice to purchase warehouse certificates of deposit issued with respect to Habaire's inventory, that it gave timely notice of the exercise of its option under the terms of the agreement, and that OFI breached the agreement by refusing to purchase the certificates. Banco de México seeks damages for breach of contract in the sum of $4,787,454.50.

OFI also moves for summary judgment. On the contract claim, OFI contends that it had no knowledge of the put option contract and that Gutierrez had no authority to negotiate the contract on its behalf. OFI also moves for summary judgment on Plaintiff's claim for contractual indemnity under the Habaire Servicing Agreement, arguing that Banco de México lacks standing to sue under the contract and that Banco de México's damages were not a direct consequence of OFI's conduct. OFI seeks summary judgment on the fraud claim because the claim was filed beyond the expiration of the statute of limitations. OFI also contends that the claim for negligent supervision must be denied because, Mexican law, which applies in this case, does not recognize that cause of action. Finally, OFI contends that the assertion of a remedy for unjust enrichment is not recognized under Mexican law, and that, in any event, all of Plaintiff's tort claims should be rejected because Plaintiff was contributorily negligent.

The Court concludes that OFI's motion for summary judgment on the contract claim should be **DENIED** and that Banco de México's motion should be **GRANTED.** On the basis of the undisputed facts, or those facts that are without substantial controversy, the record establishes that OFI authorized Raul Gutierrez to act on its behalf in Mexico, that he entered into a number of contracts with Habaire and various banking institutions, including the put option contract, and that Banco de México timely exercised the put option and OFI breached by refusing to purchase the certificates of deposit. Accordingly, Banco de México is entitled to judgment on the contract claim. With respect to the fraud and negligent supervision claims, OFI's motion is **GRANTED.** The statute of limitations had run on the fraud claim before this action was filed, and Mexican law does not recognize a claim for negligent supervision. However, OFI's motion for summary judgment on the contractual indemnity claim is **DENIED.** Genuine issues of fact exist regarding the scope of Gutierrez's power of attorney to execute the Habaire Servicing Agreement and whether J.P Morgan made a valid assignment of rights under the contract. OFI's motion with respect to the unjust enrichment claim is **DENIED**

because Mexican law expressly recognizes a parties' right to bring such a claim.

## III. DISCUSSION

### A. LEGAL STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Thus, when addressing a motion for summary judgment, the Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See id.* at 256, 106 S.Ct. 2505. Where there is no evidence demonstrating the existence of a genuine issue of material fact, the moving party may prevail simply by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. APPLICATION

Banco de México seeks partial summary judgment on its claim for breach of the put option contract. OFI has also moved for summary judgment, asserting that Banco de México's breach of contract claim, contractual indemnity claim, and tort claims fail as a matter of law.

#### 1. BREACH OF CONTRACT: PUT OPTION CONTRACT

##### a. *Existence of a Contract*

As a threshold matter, the Court examines whether the put option contract is a valid and enforceable contract. Under Mexico law, there are two requirements for the existence of a contract: (1) consent; and (2) an object which can be the subject matter of the contract. Codigo Civil Federal [C.C.F.] [Federal Civil Code], art. 1794 (Mex.).[2]

##### i. Consent

In Mexico, consent may be manifested in writing. C.C.F., art. 1803. Here, Raul Gutierrez, as OFI's agent and acting pursuant to a general power of attorney, signed and entered into the put option contract. However, OFI argues that Gutierrez did not possess valid authority to enter into the contract on its behalf. Therefore, a threshold issue is whether Gutierrez entered into the put option contract pursuant to a valid power of attorney.

###### (1) *Power of Attorney*

Banco de México contends that Gutierrez held a valid power of attorney, which granted Gutierrez the authority to enter into any agreements on behalf of OFI. Mexico law recognizes three forms of general powers of attorney: (1) general power of attorney for litigation and collections; (2) general power of attorney for acts of administration; and (3) general power of attorney for acts of ownership. 1 Jorge A.

---

2. Citations to the Mexican Civil Code and Mexican Commercial Code are made, in large part, pursuant to translations in VARGAS, JORGE A., THE FEDERAL CIVIL CODE OF MEXICO: BILINGUAL EDITION (Thomson West 2005) and VAR-

GAS, JORGE A., MEXICAN COMMERCIAL CODE ANNOTATED: BILINGUAL EDITION (Thomson West 2005). The parties do not dispute the validity of the translations.

Vargas, *Mexican Law: A Treatise for Legal Practitioners and International Investors,* § 3.22 (1998). The general power of attorney for litigation and collections is the most limited power and enables the holder to appear in court on behalf of the principal or to file a lawsuit or defend one that has been filed against the principal. Vargas, § 3.23. The general power of attorney for acts of administration includes the authority to conduct a principal's day-to-day business, including the authority to enter into contracts and sell products in the ordinary course, but not to encumber or conduct any sales of assets outside of the ordinary course. Vargas, § 3.24. The general power of attorney for acts of ownership is the broadest power under Mexican law, conferring all of the powers of the principal, which includes the authority to sell property outside of the normal course of business. Vargas, § 3.25.

To execute a valid power of attorney in Mexico, the power of attorney must conform to the rules established by the Protocol on Uniformity of Powers of Attorney Which are to Be Utilized Abroad (the "Washington Protocol"), a multilateral treaty entered into between several countries including the United States and Mexico. Protocol on Uniformity of Powers of Attorney Which Are to be Utilized Abroad, Feb. 17, 1940, 56 Stat. 1376, O.A.S. T.S. 27; *see also* Carlos M. Loperena, *Civil Justice Reform in the Americas: Lessons from Mexico,* 16 FLA. J. INT'L. L. 29, 30 (2004) ("if it is a foreign power of attorney, you have to look at the Washington Protocol...."). Under the Constitution of Mex-

ico, article 133 states that all treaties shall be incorporated into domestic law. Constitución Política de los Estados Unidos Mexicanos [Const.], *as amended,* art. 133, 5 de Febrero de 1917 (Mex.). In addition, the *Jurisprudencia,* judicial decisions that are binding precedent on Mexican courts, establishes that courts shall look to compliance with the Washington Protocol, and not to the civil or commercial codes of Mexico, to determine the validity of a power of attorney granted by an entity abroad to be used in Mexico. 78 S.J.F. 12 (8a época, 1994).

Here, on December 22, 1999, Brent Church ("Church"), President of OFI, issued Gutierrez a general power of attorney for (1) legal actions and collections and (2) acts of administration. (Pl.'s Exs. Opp'n Def.'s Summ. J., Ex. 14.) The power of attorney is accompanied by a notarial certification by Howard Choi, a notary in the United States, certifying that Church personally appeared and had legal capacity to execute the power. (SAC, Ex. A at 66.) Gutierrez then provided the power of attorney to Jose Antonio Manzanero, a notary in Mexico, who approved the document under Mexican law for use in Mexico. (SAC, Ex. A at 68–71.) Thus, the Court concludes, based on the documents provided, that Gutierrez entered into the put option contract pursuant to a valid power of attorney. As the Court finds that Gutierrez's power of attorney is sufficient to bind OFI, a discussion of whether Gutierrez possessed authority as a *factor* or *dependiente* under Mexican commercial law is unnecessary.[3]

---

**3.** The parties dispute whether analyzing Gutierrez's authority under the Mexican Commercial Code is appropriate. Banco de México contends that Gutierrez possessed authority to enter into the put option contract as a *factor* or *dependiente* of OFI. A *factor* is an official of a company or commercial entity or a person authorized to engage in all business matters relating to those entities or companies on behalf of and in the

name of its owners. Código de Comercio [CÓD.COM.] [Federal Commercial Code], art. 309 (Mex.). A *dependiente,* or employee, is a person who continuously performs one or various activities inherent to a particular business in the name of or on account of its owners. *Id.,* art. 309. A *dependiente* has the power to bind the company, without any written mandate, provided that the business

However, OFI argues that the operative power of attorney fails to meet the requirements of Article I of the Washington Protocol.[4] Under Article I of the Washington Protocol, "[i]f the power of attorney is executed by or on behalf of a natural person, the attesting official, shall certify from his own knowledge [1] to the identity of the appearing party and [2] to his legal capacity to execute the instrument." (Washington Protocol, art. 1.) Specifically, OFI claims that the notarization fails to establish that the notary reviewed the documents necessary to show that Church had the legal authority to execute the instrument. However, the notarial certification clearly acknowledges that Church personally appeared and is "personally known to me." (SAC, Ex. A at 66.) Furthermore, the notary indicates that Church acted in his capacity as President of OFI. (*Id.*) Under the plain language of the treaty, the notarial certification meets the requirements of the Washington Protocol.

### (2) Gutierrez's Authority

Gutierrez, vested with the authority of a valid general power of attorney, possessed the authority to enter into contracts in the ordinary course. Specifically, Gutierrez's power of attorney includes the power to "represent the company in the drafting and signing of any type of contracts . . . and any other document concerning business operations of the company executed in the United Mexican States." (SAC, Ex. A at 44.) David Prince, counsel for OFI, in a letter to a Banco representative in December 2003, stated that "Raul Gutierrez . . . [is] authorized to represent the corporation in all aspects of its daily operation, *including the business model utilizing the PUT*." (Pl.'s Not., Ex. 35 (emphasis added); *see also id.*, Ex. 19 [Brent Church letter to FIRA dated May 5, 2004] (noting that Raul [Gutierrez] would "represent OFI's interest in the Mexico operation," which included a put to secure the purchase of shrimp).) Moreover, the put option contract explicitly indicates that Gutierrez, as OFI's legal representative, "has sufficient power to subscribe [sic] this type of contract, as is evidenced by a general power of attorney . . . issued to him on 22 December 1999 . . . and his powers have not been modified or revoked in any way as of the date of the within contract." (*Id.*, Ex. 33 at 4.) Finally, in September 2005, approximately ten (10) months *after* consummation of the put option contract, Church sent a letter to FIRA verifying that Gutierrez remained employed by OFI with "the same duties and power of attorney as always." (Rudin Decl., Ex. 48.)[5]

Here, based on the evidence, it appears that OFI clearly intended for Gutierrez to possess the authority pursuant to

---

is within the scope of such employee's duties. *Id.*, art. 321; Vargas, § 3.13. OFI, however, claims that the Mexican Commercial Code is not relevant and that Banco de México's argument is immaterial. Since the Court concludes that there are other grounds for holding that Gutierrez had the authority to bind OFI in the relevant transactions, it need not resolve this issue.

4. OFI also asserts that the power of attorney must comply with paragraph 3 of Article I in order to be valid. Paragraph 3, however, deals with a "juridical person," where juridical is defined as "[o]f or relating to judicial proceedings or to the administration of jus-

tice." BLACK'S LAW DICTIONARY 383 (2d ed. 2001). There is no evidence in the record and OFI sets forth no argument as to why Gutierrez should be considered a "juridical person." The second and third paragraphs of Article I are not applicable.

5. The Court notes that OFI has, from time to time, claimed that the power of attorney was revoked in early 2005. (*See, e.g.*, Pl.'s Mot. Summ. J., SGI ¶ 67; Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 41 at 345, Ex. 58 [Answer to Interrogatory No. 4].) However, even if that were true, the transaction at issue was consummated in late 2004 at a time when even OFI concedes that the power was in effect.

the general power of attorney to enter into the put option contract. Evidence indicates that before—and after—the put option contract's execution, Gutierrez possessed a power of attorney that granted him sufficient authority to enter into the agreement. Therefore, the Court finds that Gutierrez's execution of the put option contract was an act within the powers of his general power of attorney.

### (3) Gutierrez's Visa

OFI maintains that Gutierrez did not have authority under his visa to enter into any contract in Mexico on behalf of OFI. It is an undisputed fact that Gutierrez is not a citizen of Mexico. (Def.'s Mot. Summ. J., SGI ¶ 13.) Gutierrez is a foreigner, defined under Mexican law as one who is not a Mexican national by birth or by naturalization *See* Jorge A. Vargas, *Rights and Obligations of Americans in Mexico Under Immigration Law and Other Areas of Mexican Law*, 42 U. RICH. L. REV. 839, 845–46 (2008). OFI argues that a foreigner like Gutierrez "shall only be allowed to pursue those activities expressly authorized by the Department. . . ." Regalmento de la Ley General de Población ("R.L.G.P."), art. 139. A foreigner may pursue activities other than those for which he has been authorized as long as permission is given from the Department. R.L.G.P., art. 140, 152.

Here, the visa issued to Gutierrez states that the authorized activity is "for the sole purpose of rendering his services as General Manager of the company 'Habaire, S.A. de C.V.'" (SAC, Ex. A at 40.) OFI contends that Gutierrez did not possess authority to enter into the relevant agreements, thus nullifying them. However, OFI's argument lacks evidentiary support. There is no indication that acting beyond the activities authorized in a visa nullifies the execution of documents such as the put option contract or the Habaire Servicing Agreement. (*See* Rudin Decl. Supp. Def.'s

Mot. Summ. J., Ex. 9 [Nuñez Depo.] at 252–53.) Moreover, OFI has not presented evidence indicating that execution of the agreements fell outside the authority granted to Gutierrez in his visa. There is simply no evidence establishing the scope of Gutierrez's authority as General Manager of Habaire or whether it included execution of the operative contracts. The Court concludes that OFI's motion summary judgment on this ground must be denied.

### ii. Subject Matter

The purpose of the put option contract, which provided Habaire with inventory financing and Banco de México with security for the arrangement through the put-option, was proper subject matter of a contract. *See* C.C.F., arts. 1824, 1826. Here, the parties do not dispute that the objective of the contract complies with Mexican law. Therefore, the Court concludes that the purpose of the put option contract is proper subject matter giving rise to the existence of a contract.

### b. Breach

Banco de México asserts that OFI breached the put option contract by failing to purchase the certificates of deposit after Banco exercised its put option. The put option contract requires Banco de México to exercise its option to sell the certificates of deposit within thirty (30) days of receipt of the certificates of deposit. (Pl.'s Not., Ex. 33 at 6.) It is undisputed that Banco de México exercised its option under the agreement on March 7, 2007. (Pl.'s Mot. Summ. J., SGI ¶ 61.) Therefore, Plaintiff must show that Plaintiff received validly transferred certificates of deposit **on or after** February 5, 2007 (thirty days prior to March 7, 2007).

OFI asserts several objections to the validity of the evidence offered to show that Plaintiff properly exercised its option under the agreement. Specifically, OFI

claims that: (1) Banco de México failed to provide sufficient evidence authenticating the certificates of deposit; (2) Banco de México failed to timely exercise its option; and (3) the warehouse that issued the certificates of deposit was never authorized to do so.

### i. Certificates of Deposit

OFI argues that Enrique Soto ("Soto") lacks personal knowledge required to: (1) authenticate each certificate of deposit; (2) verify any of the signatures of the certificates of deposit; (3) verify that each representative that signed the certificate of deposit had authority to do so on behalf of the entity purportedly represented; or (4) confirm the dates on which the certificates were signed. However, based on the record, it appears that Soto is precisely the person at FIRA that possessed such knowledge regarding the certificates of deposit. Soto is the Subdirector of Investment Banking for FIRA and would be expected to be familiar with documentation used to secure financial transactions and the entities that issue such documents. In this particular case, he states that he has personal knowledge regarding the authenticity of the certificates of deposit that were submitted as security for the Stage 2 financing. (Soto Decl. ¶¶ 1, 69, 71.) Moreover, OFI has submitted evidence indicating that Soto is one of the individuals who actually received the endorsed certificates of deposit from Invex. (Rudin Decl., Exs. 12, 13.) The Court concludes that Soto possesses sufficient personal knowledge regarding the authenticity of the certificates of deposit and the date of endorsement, both of which are pertinent to the contract claim.

### ii. Whether Plaintiff Timely Exercised the Put Option

OFI argues that Banco de México lacks evidence to establish a valid chain of title for each certificate of deposit. However, the certificates of deposit indicate that J.P. Morgan, as trustee of the SPV, transferred the certificates of deposit to the commercial banks, Invex and IXE. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Exs. 70, 72.) The certificates also show that Invex and IXE then transferred the certificates of deposit to Banco de México. (*Id.*) However, OFI asserts that two certificates of deposit bearing nos. 27292 and 25934 appear to have endorsements from Invex dated January 16, 2007, more than thirty days before Banco de México exercised the put option.[6] (Rudin Decl. Opp'n Pl.'s Mot. Summ. J., Exs. 14, 15.) Banco de México, however, correctly points out that Exhibits 14 and 15 to Mr. Rudin's declaration show that the certificates were endorsed to Banco de México in its capacity as trustee for FEGA. Under the terms of the put option contract, Banco de México's time for exercising the put option begins to run when it receives certificates of deposit endorsed to FOPESCA, not to FEGA.[7] Banco de México asserts that the certificates of deposit were endorsed incorrectly and ineffectively transferred; thus, the thirty day period was not triggered on that date. Significantly, OFI has failed to produce any evidence that FOPESCA received certificates of deposit from any commercial bank on a date earlier than February 9, 2007.

After examining the certificates of deposit in the record, the endorsements establish that Invex endorsed its certificates of deposit to Plaintiff on February 9, 2007, and that IXE endorse its certificates of

---

6. Plaintiff does not dispute that it received the certificates of deposit in January 2007, albeit in its capacity as trustee for FEGA and not FOPESCA.

7. Plaintiff has produced certified copies of the final versions of the certificates of deposit that Invex endorsed to Banco de México in its capacity as trustee for FOPESCA. (Pl.'s Exs. Supp. Mot. Summ. J., Exs. 69, 70.)

deposit to Plaintiff on February 16, 2007. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Exs. 70, 72.) The Court concludes that both dates fall within thirty days of March 7, 2007 and that Banco de México timely exercised its option under the contract.

### iii. Whether Almacenadora General, S.A. de C.V. had Authority to Issue Certificates of Deposit

OFI asserts that the general deposit warehouse that issued the certificates of deposit, Almacenadora General, S.A. de C.V. ("Almacenadora General"), was never authorized to issue certificates of deposit to Habaire. At Session No. 3/2004, FIRA's Technical Committee authorized the financing of shrimp commercialization through Habaire in the terms of a memorandum. The memorandum outlined the terms of the financing scheme and authorized the use of three general deposit warehouses in Mexico to issue certificates of deposit to Habaire: (1) Accel, (2) Almer, and (3) Argo. (Rudin Decl., Ex. 9.) Almacenadora General, however, was never mentioned as a general deposit warehouse in the memorandum.

■ OFI argues that failure to comply with the memorandum and acting outside the authorization caused Plaintiff to breach the put option contract. The Court first notes that this term, which as noted below is not included in the put option contract, appears designed for the protection of the commercial lenders and Banco de Mexico, not OFI. Moreover, while it appears to be true that Plaintiff did not have authorization under the memorandum to use Almacenadora General as a general deposit warehouse, the put option contract does not specifically incorporate the memorandum into its terms. The contract merely references the Technical Committee's approval of the financing plan. Thus, the use of a specific warehouse was not a term in the put option contract. Accordingly, the memorandum's failure to allow for use of

Almacenadora General does not prohibit Plaintiff from recovering under the contract.

### iv. Conclusion re: Breach

Here, after Plaintiff timely exercised its option on March 7, 2007, it is an undisputed fact that OFI refused to purchase the certificates of deposit from Plaintiff. (Pl.'s Summ. J., SGI ¶ 64.) Thus, by failing to perform its obligation, OFI breached the put option contract. Accordingly, Banco de México's motion for partial summary judgment on the contract claim is **GRANTED;** OFI's motion as to this claim is **DENIED.**

### c. Banco's Remedy

#### i. Sale Price

Because OFI breached the put option contract, Plaintiff is entitled to the total sale price for the certificates of deposit according to the formula set forth in Article 3 of the put option contract. (Pl.'s Not., Ex. 33 at 6.) The total sale price of the certificates of deposit that OFI failed to purchase is approximately $4,787,454.50. (Ray Decl. ¶ 3.)

#### ii. Default Interest

Under Article 5 of the put option contract, Plaintiff is entitled to "late penalties on the amounts owned [sic] and unpaid" at a specified interest rate. (*Id.*, Ex. 33 at 7.) "Said interest shall accrue from the date on which the default occurs until the date on which the total amount of the sums owed is collected." (*Id.*) As the put option contract specifically provides for default interest, the Court finds that this remedy is appropriate.

#### iii. Expenses

Article 7 of the put option contract provides that "[a]ny expenses that may have to be paid to the general deposit warehouse that issued the Certificate of Deposit, and in general any other expense generated in relation to said expenses, must be

paid by the Company [OFI]." (*Id.*, Ex. 33 at 7.) Therefore, the Court awards all expenses consistent with the terms of the put option contract.

### iv. Court Costs

Plaintiff seeks a ruling regarding whether OFI may be held liable for court costs, in an amount to be proven at trial, because OFI: (1) falsely denied its knowledge of the existence of the put option contract; and (2) asserted that it had revoked Gutierrez's power of attorney, when it had not. As a result of these false assertions, Plaintiff was forced to incur fees and expenses unnecessarily in this litigation. Plaintiff relies on the Mexican Commercial Code as a basis for recovering costs of litigation. Article 1082 of the Mexican Commercial Code provides that "[e]ach party shall be immediately responsible for costs incurred or the judicial procedures he promotes." CÓD.COM., art. 1082. In addition, one party shall indemnify the other party where the former "interposed frivolous or inappropriate defenses or motions for the purpose of delaying the proceedings." *Id.* Article 1084 states that costs shall be imposed "if in the opinion of the judge, a party proceeded without justiciable right or in bad faith." *Id.*, art. 1084. Costs shall always be imposed on whomever "institutes an action or asserts defenses or objections, motions or appeals that are spurious...." *Id.*

The Court finds that a ruling regarding costs under Mexican law is premature. While the Court has summarily adjudicated Banco's first cause of action, much of the case remains to be litigated. Therefore, any award for court costs shall be determined at the conclusion of the case.

### 2. CONTRACTUAL INDEMNITY: HABAIRE SERVICING AGREEMENT

#### a. Power of Attorney

As the Court has already determined that Gutierrez acted pursuant to a valid general power of attorney, the issue of validity will not be discussed with regard to the Habaire Servicing Agreement. Instead, OFI argues that Gutierrez could not have executed the Habaire Servicing Agreement without OFI's grant of a general power of ownership, a form of general power of attorney that was not granted to Gutierrez. OFI's expert, Antonio Maldonado ("Maldonado"), asserts that because OFI did not receive any consideration in exchange for its promise to indemnify J.P. Morgan for damages caused by the breach of Habaire's obligations under the Habaire Servicing Agreement, such indemnification is tantamount to an encumbrance of the assets outside of the normal course of business, which requires a general power of attorney of ownership. (Def.'s Mot. Summ. J., Ex. 2 at 3.)

■ First, the Court does not accept, on the basis of the record before it, that OFI received no consideration for the indemnification. OFI was the moving force behind the entire transaction, which was designed for the principal purpose of providing OFI with inventory (shrimp) to sell to its customers. Habaire was involved in the transaction solely because OFI needed an agent to conduct its business in Mexico. Moreover, a persuasive argument can be made that the authority to indemnify J.P. Morgan falls within the power granted in a power of attorney for acts of administration. Available evidence and research shows only that the sale or encumbrance of assets would require a general power of attorney of ownership. An act of indemnification is qualitatively different from a sale or encumbrance of assets. Here, OFI agreed to repay funds that its agent, Habaire, had borrowed. Gutierrez's general power of attorney for acts of administration includes the authority to conduct OFI's daily operations in Mexico, including the authority to enter into contracts in the

ordinary course. At this juncture, the Court cannot say whether an agreement of indemnification constitutes an act of administration or an act of ownership under Mexican law. Thus, whether indemnification falls within the general power of attorney for acts of administration is an issue that precludes summary judgment.

### b. Standing to Sue

OFI claims that Banco de México lacks standing under the Habaire Servicing Agreement because Banco de México was not a party to the agreement. The Habaire Servicing Agreement was signed by Habaire, OFI, and J.P. Morgan; Banco de México was not a party to the contract. (SAC, Ex. B at 13.) Plaintiff, however, has submitted evidence that J.P. Morgan assigned to Plaintiff its rights under the Habaire Servicing Agreement. Banco de México has produced a document which assigns the rights under the Habaire Servicing Agreement from The Bank of New York Mellon, S.A., J.P. Morgan's successor-in-interest, to Banco de México. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 79.)

■ Notwithstanding the Assignment of Rights Agreement, OFI claims that Banco de México has failed to produce any evidence that The Bank of New York Mellon received a valid assignment of rights under the Habaire Servicing Agreement from J.P. Morgan. However, the document clearly indicates that J.P. Morgan assigned all of its rights and obligations as trustee to The Bank of New York Mellon as of November 24, 2008. (*Id.* at 2–3.) Therefore, the agreement is sufficient to create a genuine issue of fact regarding Banco de

México's standing under the Habaire Servicing Agreement.

OFI also claims that Banco de México failed to comply with the notice requirement of the Habaire Servicing Agreement. The second paragraph twelve of the Habaire Servicing Agreement provides that "Principal [J.P. Morgan] may assign its rights pursuant to the present agreement by means of a simple written notice it addresses to Commission Agent [Habaire]." (SAC, Ex. B at 12.) Banco de México asserts that it attempted to provide notice of The Bank of New York Mellon's assignment to Plaintiff at OFI's designated address, but found the premises empty. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 80.) Therefore, a genuine issue of fact also remains with regard to Banco de México's compliance with the notice requirement.[8] Accordingly, OFI's motion for summary judgment on the basis of standing under the Habaire Servicing Agreement is denied.

### c. "Direct and Immediate Consequence"

OFI claims that Banco de México fails to allege, or produce any admissible evidence of, damages suffered by J.P. Morgan as the result of OFI's breach of its obligations under the Habaire Servicing Agreement. Banco de México, however, claims that it suffered damages because of Habaire's failure to make repayments and OFI's failure to indemnify J.P. Morgan under the Habaire Servicing Agreement. Specifically, Habaire borrowed money from Invex and IXE, which it failed to repay, and OFI's subsequent failure to indemnify J.P.

---

**8.** OFI contends that Habaire never "actually received" notice of the assignment. The Habaire Servicing Agreement provides that notices shall be made in writing to the domicile stated in the recitals of the agreement and "shall become effective when they are actually received by the party to whom they are addressed pursuant to this clause." (SAC, Ex. B at 11.) Here, Habaire's absence at the address made it implausible for Plaintiff to deliver notice in accordance with the agreement. The evidence shows that Plaintiff attempted to deliver notice, but was thwarted by Habaire's change in location. Plaintiff has also indicated that it provided OFI with notice of the assignment. (Pl.'s Opp. at 14.)

Morgan required Plaintiff to pay Invex and IXE its contractual guarantees. Because OFI failed to indemnify J.P. Morgan, Banco de México faced a direct loss by having to make guarantee payments to the commercial banks. Evidence of these payments creates a genuine issue of material fact as to whether Banco de México suffered damages as a direct result of OFI's breach.

### d. Conclusion re: Indemnity under the Habaire Servicing Agreement

For the foregoing reasons, OFI's motion for summary judgment regarding Banco de México's claim for contractual indemnity as to the Habaire Servicing Agreement is **DENIED**.

### 3. TORT CLAIMS

OFI moves for summary judgment on all of Banco de México's tort claims. OFI asserts various defenses with regard to Banco's claims for fraud, negligent supervision, and unjust enrichment. The Court will address OFI's motion as to each claim in turn.

### a. Fraud [9]

Banco de México alleges that OFI is liable for fraudulent inducement. Banco de México claims it entered into the relevant contracts because OFI indicated to FIRA that it intended to buy all of Habaire's shrimp. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 25.) Article 2106 of the Mexican Civil Code states "[l]iability re-

sulting from fraud can be claimed in regards to any obligation." C.C.F., art. 2106. Furthermore, "[d]amages and losses must be a direct and immediate consequence of the failure to comply with the obligation, whether they have already occurred or will necessarily occur." C.C.F., art. 2110. Article 1815 also states that "[d]eception in contracting shall mean any suggestion or artifice used to induce other parties into error or keep them in that state" and it shall be bad faith to cover up an error once it has been discovered. C.C.F. art. 1815.

Here, Plaintiff has provided sufficient evidence to show OFI made a misrepresentation to induce Plaintiff to extend financing. The Court finds that Banco de México's allegations that OFI improperly induced it into entering into the operative agreements fall within the statute's definition of deception.

Notwithstanding the existence of a fraud claim under Mexican law, Banco de México's fraud claim is barred by the applicable statute of limitations. Both parties rely on article 1934 of the Mexican Civil Code,[10] which states that the statute of limitations for a cause of action in tort under Mexico law is "two [2] years from the date the damage occurred." C.C.F., art. 1934. The main issue is from what date the statute of limitations begins to run. OFI argues that the statute of limitations for torts in Mexico begins to run at the mo-

---

**9.** OFI argues that Plaintiff's claim for fraud must fail because the claim of fraud must be pled with particularity under Federal Rule of Civil Procedure 9(b). However, the claim that fraud must be pled with particularity is a procedural argument that was denied at the motion to dismiss stage of this case. Furthermore, the summary judgment stage examines the sufficiency of the evidence, and does not analyze the sufficiency of the pleadings. Therefore, this argument is rejected.

**10.** Although both parties rely on article 1934 establishing a two-year statute of limitations for tort liability, article 1161(v) of the Mexican Civil Code also establishes a two-year statute of limitations for unlawful acts. An unpublished Ninth Circuit decision cites article 1161(v) as the statute of limitations for fraud claims, explaining in dictum that the limitations period begins to run at the time the alleged fraudulent acts are performed. *Brady v. Brown*, Nos. 93–55669, 93–55683, 1995 WL 120657, at *2 (9th Cir. Mar. 21, 1995).

ment the act of fraud occurred. Maldonado, OFI's expert, states that the statute of limitations begins to run not from the date of discovery of the fraud, but from the date the harm was caused. (Rudin Decl. in Supp. Def.'s Mot. Summ. J., Ex. 2 at 13.) Banco de México has failed to produce any expert evidence regarding the statute of limitations. Plaintiff asserts, without citing to any authority, that the date Plaintiff suffered damage was OFI's failure to perform its obligations under the contracts. Thus, because Banco de Mexico has not produced any evidence to rebut OFI's argument regarding the statute of limitations.

■ Accepting OFI's expert's statement as true because it has not been controverted, the Court must accept the proposition that Banco de Mexico suffered harm, and that the cause of action therefore accrued, when OFI fraudulently induced Banco de México to enter into the Habaire Servicing Agreement and the put option contract. Because Banco de México filed its initial complaint on October 29, 2007, the fraudulent act must have been performed after October 29, 2005, two years prior to the filing of the complaint. However, OFI entered into the Habaire Servicing Agreement on June 4, 2004, and the put option contract on November 15, 2004. Because both agreements were entered into more than two years before the filing of the initial complaint, Banco de México's claim for fraud is barred by the statute of limitations. OFI's motion for summary judgment as to Banco de México's eighth cause of action regarding fraud is **GRANTED.**

### b. Negligent Supervision

■ Banco de México alleges that OFI is liable for negligent supervision due to its failure to provide Gutierrez with adequate training and supervision in connection with Gutierrez's management and control of Habaire. OFI argues, and Banco de Méxi-

co concedes, that Mexico law does not recognize a cause of action for negligent supervision. (Def.'s Mem. at 22; see also Pl.'s Opp. at 16.) OFI's expert, Maldonado, states that the cause of action for negligent supervision, as it is understood in the United States, does not exist in Mexico. (Rudin Decl., Ex. 2 at 12.) Banco de México has failed to provide any evidence to the contrary.

However, Banco de México does argue that OFI may be held liable under article 1918 of the Mexican Civil Code, which states: "[l]egal entities are liable for the damages and injuries caused by their lawful representatives in the performance of their duties." C.C.F., art. 1918. However, this claim is not one of negligent supervision, but rather a form of vicarious liability. Similarly, Plaintiff alleges that "managers and owners of commercial establishments" are liable "for the damages and injuries caused by their employees, or other dependents in the performance of their duties." C.C.F., art. 1924. This article again addresses a type of employer's liability that is different from the negligent supervision claim asserted by Plaintiff. Plaintiff asserts only that OFI knew, or with reasonable diligence, should have known that Gutierrez was neither qualified nor able to properly manage Habaire's business, and that OFI failed to properly train and supervise Gutierrez in his management and control of Habaire. (SAC ¶¶ 193–94.) These claims address OFI's liability for Gutierrez's acts in performance of his duties, and not its liability for failure to properly supervise. Banco de México's claim for negligent supervision must fail because there is no evidence suggesting that Mexican law recognizes a cause of action for negligent supervision. Therefore, OFI's motion for summary judgment as to Plaintiff's tenth cause of action for negligent supervision is **GRANTED.**

Moreover, Plaintiff's negligent supervision claim is also likely barred by Mexico's two-year statute of limitations for torts. C.C.F., art. 1934. If OFI was negligent in its hiring of Gutierrez or its supervision of Gutierrez when he entered into the put option contract and Habaire Servicing Agreement, then the negligent supervision claim would be time-barred. Gutierrez entered into the Habaire Servicing Agreement and put option contract in June 2004 and November 2004, respectively. Because Plaintiff filed its initial complaint on October 29, 2007, to the extent any Banco asserts a claim for negligent supervision arising out of the operative agreements, the claim is barred by the statute of limitations.

### c. Unjust Enrichment

Plaintiff claims that OFI was unjustly enriched by the benefits stemming from the OFI–Habaire Agreement, the put option contract, and the financing and guarantees that made these agreements possible. (SAC ¶ 26.) OFI asserts that a claim for unjust enrichment does not exist under Mexico law. (Def.'s Mem. at 15; *see also* Rudin Decl., Ex. 2 at 14.) However, both parties recognize that Mexico recognizes a similar cause of action for "illegitimate enrichment:" "[w]hoever becomes enriched without justification at the expense of another shall be obligated to indemnify the other person for his loss in the proportion of the former's restitution." [11] C.C.F., art. 1882. In order to prevail on a claim for illegitimate enrichment under Mexico law, Banco de México must show: (1) OFI was

enriched at Banco de México's expense; (2) Banco de México suffered a loss; and (3) OFI had no justification for its actions. *Id.*

▮ Here, the parties are in dispute as to whether OFI was enriched at Plaintiff's expense and whether Banco's loss was a "direct and immediate consequence" of OFI's conduct. OFI argues that Plaintiff has not shown any evidence establishing that Plaintiff made any financing directly available to OFI or that OFI was the direct beneficiary of Plaintiff's financing efforts. Plaintiff, however, alleges that OFI was able to "purchase shrimp from Habaire that would not have been available but for the special financing arrangements Plaintiff made available to Habaire" and "purchase shrimp from Habaire on more favorable terms and at more favorable prices than would have been available but for the special financing arrangements." (SAC ¶ 26.) For example, Plaintiff avers that the structured finance program had the effect of freeing up millions of dollars OFI normally advances to fishermen in pre-season loans. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 24.) In addition, Plaintiff has submitted evidence showing that under the put option contract, OFI would receive millions of dollars in inventory financing plus advantageous shrimp pricing in the event of Habaire's default. (Pl.'s Exs. Opp'n Def.'s Mot. Summ. J., Ex. 10 at 255–63.) Finally, the Court finds that Banco de México suffered direct losses by loaning funds that were

---

**11.** The only published decision in the United States that has interpreted article 1882 is a Fifth Circuit case, *Morris v. LTV Corporation*, 725 F.2d 1024 (5th Cir.1984). In *Morris*, Plaintiff, a real estate broker, sued LTV Corporation for its commission in connection with the sale of a hotel. *Id.* at 1025. Plaintiff contended that it was owed compensation for its efforts related to the sale. *Id.* at 1026. The Fifth Circuit held that Plaintiff had failed

to meet its burden of proof for its claim of unjust enrichment because the trial court's findings showed that Plaintiff had conferred no enrichment or benefit upon the OFI. *Id.* at 1032. In fact, the trial court found that Plaintiff was not the procuring cause of the sale, that the buyer was not aware of Plaintiff, and that the sale would have occurred independent of Plaintiff's efforts. *Id.* at 1032.

never paid back due to OFI's conduct. Therefore, Banco de México has produced evidence giving rise to a genuine issue of material fact as to whether it conferred a benefit on OFI at Banco de México's expense and whether Banco de México's loss was a "direct and immediate consequence" of OFI's conduct. Accordingly, OFI's motion for summary judgment as to the unjust enrichment claim is **DENIED**.

### d. Contributory Negligence

OFI contends that Banco de México's contributory negligence is an absolute bar to any tort claim under Mexican law. Specifically, Banco de México is barred from asserting any tort claim because it failed to procure a valid power of attorney and failed to ensure that Gutierrez's visa legally authorized him to enter into contracts on behalf of OFI in Mexico. Under article 1910 of the Mexican Civil Code, a defendant is no longer obligated to compensate the plaintiff if the defendant can "prove the damage was caused as a result of the fault or inexcusable negligence of the victim." C.C.F., art. 1910. OFI's motion for summary judgment on this ground is denied for several reasons. First, OFI offers no evidence that Banco de México's had any duty to ensure that Gutierrez obtained a valid power of attorney. Further, the efforts of Mexican authorities to determine the scope of Gutierrez's authority were met with assurances from OFI's representatives that Gutierrez had such authority. As noted above, OFI was giving assurances, as late as September 2005, that Gutierrez's authority under the power of attorney had not been changed or diminished. Furthermore, none of the tort claims is dependent on the validity of a power of attorney or the scope of a visa. Banco de México's alleged negligence in ensuring the validity of the visa has no bearing on OFI's failure to repurchase the certificates of deposit from J.P. Morgan or to indemnify J.P. Morgan under the Habaire Servicing Agreement. For these reasons, OFI's argument to grant summary judgment on the ground of contributory negligence is rejected.

## IV. CONCLUSION

The Court concludes that OFI's motion for summary judgment on the breach of contract claim is **DENIED** and that Banco de México's motion is **GRANTED**. The Court notes that the total amount owed under the put option contract is to be offset by $592,394.00, which represents the proceeds Plaintiff received from the warehouse's sale of the shrimp Habaire deposited in exchange for the certificates of deposit.

OFI's motion for summary judgment as to Plaintiff's contractual indemnity and unjust enrichment claims is **DENIED**. OFI's motion with respect to the fraud and negligent supervision claims is **GRANTED**.

**IT IS SO ORDERED.**